UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                            :

K.H.,                                      :
                                            :

                Plaintiff,                 :       12-CV-1680 (ARR) (MDG)
                                            :

       -against-                        :       NOT FOR ELECTRONIC
                                            :       OR PRINT PUBLICATION

NEW YORK CITY DEPARTMENT OF EDUCATION; :
CARMEN FARIÑA, in her official capacity as    :       OPINION AND ORDER
Chancellor of the New York City School District, :

                Defendants.            :
                                            :
------------------------------------------------------------------- X

ROSS, United States District Judge:

      Plaintiff K.H.[1] brings this action under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400 et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section

504"), codified at 29 U.S.C. § 794; Section 1983 of the Civil Rights Act ("Section 1983"), 42

U.S.C. § 1983; and New York state law. Plaintiff, who is now 25 years old, asserts that the New

York City Department of Education ("DOE")[2] failed to provide him with adequate special

education programs and services during his entire career in the New York City public schools

and discriminated against him on the basis of disability.

      Plaintiff originally brought these claims in an administrative hearing before an Impartial

Hearing Officer ("IHO") pursuant to the procedures of the IDEA and New York state law. The

IHO dismissed some of plaintiff's claims as time-barred, dismissed other claims on jurisdictional

---

[1] The parties have referred to plaintiff by his initials in all publicly filed documents to protect his privacy, and the court will do the same.

[2] The complaint named as defendants the DOE and then-Chancellor Dennis Walcott in his official capacity. The New York City schools were previously operated by a Board of Education that was reorganized and renamed the DOE in 2002. See Romero v. City of N.Y., 839 F. Supp. 2d 588, 601 n. 8 (E.D.N.Y. 2012). The DOE is the proper defendant in this suit, and the court will use the term "DOE" throughout the opinion for simplicity, even though some of the events giving rise to plaintiff's claims occurred before 2002. The Chancellor of the DOE is now Carmen Fariña, so the court has substituted her for Walcott as a defendant. Fed. R. Civ. P. 25(d). The Clerk of Court is requested to update the docket accordingly.

grounds or on the merits, and awarded plaintiff compensatory relief for his remaining claims. On appeal, the State Review Officer ("SRO") largely upheld the IHO's determinations but awarded some additional compensatory relief. Plaintiff now brings this suit challenging the rulings of the IHO and SRO that were not in his favor and seeking relief for the claims that the IHO and SRO dismissed or failed to address.

Now before the court is defendants' motion for partial summary judgment. Defendants seek to dismiss the majority of plaintiff's IDEA, Section 504, and Section 1983 claims under the applicable statutes of limitations. For the reasons set forth below, I find that plaintiff has asserted a timely claim for the denial of a free appropriate public education during all of the years that he was eligible to attend DOE schools. Accordingly, I find that the IHO's and SRO's rulings summarily dismissing many of plaintiff's claims as time-barred are not supported by a preponderance of the evidence. At this stage of the litigation, all of plaintiff's claims can go forward, and defendants' motion for partial summary judgment is denied.

## BACKGROUND

I. **Statutory Framework**

A. **IDEA**

Under the IDEA, states receiving federal funding are required to provide a "free appropriate public education" to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). A free appropriate public education consists of "special education and related services" that are provided in accordance with an individualized education program ("IEP"). 20 U.S.C. § 1401(9). The IEP, which is "the centerpiece of the statute's education delivery system for disabled children," is a written document that "sets out the child's present educational performance,

establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311 (1988). The IEP must be developed by a team including the child's parents, teachers, representatives of the district, and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). The team must review the IEP at least once a year and revise it "as appropriate." 20 U.S.C. § 1414(d)(4)(A).

In order to provide a free appropriate public education, the IEP must ensure "access to specialized instruction and related services which are individually designed to provide educational benefit" to the child. Bd. of Educ. v. Rowley, 458 U.S. 176, 201 (1982) (interpreting the Education for All Children Act, subsequently amended and renamed IDEA). The IDEA expresses a "strong preference" for educating children with disabilities alongside their non-disabled peers, so "special education and related services must be provided in the least restrictive setting consistent with a child's needs." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citing 20 U.S.C. § 1412(a)(5)(A)).

The IDEA applies to children between the ages of 3 and 21, though states have some flexibility regarding the ages of eligibility. 20 U.S.C. § 1412(a)(1). Under New York law, children with disabilities are entitled to special education services until they receive a high school diploma or complete the school year following their twenty-first birthday. N.Y. Educ. Law § 4402(5). After this point, a child is no longer entitled to the protections of the IDEA. See Somoza v. N.Y.C. Dep't of Educ., 538 F.3d 106, 113 (2d Cir. 2008). However, a child who is above the age of eligibility can receive "compensatory education," which is "prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education." Id. at 109 n.2. "An

award of compensatory education is appropriate only for gross violations of the IDEA." Id.

The IDEA establishes a number of "procedural safeguards" to ensure parental involvement in the special education process. 20 U.S.C. § 1415. For example, a school district is required to provide "Prior Written Notice" to a parent whenever the district proposes to initiate or change, or refuses to initiate or change, a child's special education services. 20 U.S.C. § 1415(b)(3). In addition, the district must provide a "Procedural Safeguards Notice" to a parent annually and whenever the child is referred for an evaluation, a complaint is filed, or the parent requests one. 20 U.S.C. § 1415(d)(1)(A). The Procedural Safeguards Notice must be "written in an easily understandable manner" and outline various rights that parents have under the IDEA. 20 U.S.C. § 1415(d)(2).

The IDEA's procedural safeguards provisions also set out the process by which parents can bring claims regarding their children's special education services. A parent of a child with a disability has the right to bring a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). If the district does not resolve the complaint, the parent has the right to an "impartial due process hearing." 20 U.S.C. § 1415(f). In New York, the hearings are conducted by an IHO appointed by the local school district. N.Y. Educ. Law § 4404(1)(a). At the impartial hearing, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003); see N.Y. Education Law § 4404(1)(c) ("The . . . school district . . . shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing.").[3] New York establishes a second level of

---

[3] The statute includes an exception, not relevant here, which specifies that "a parent . . . seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on

administrative review by which either party can appeal the IHO's decision to the SRO. N.Y.

Educ. Law § 4404(2). Either party can challenge the SRO's decision by filing a civil action in

state or federal court. 20 U.S.C. § 1415(i)(2)(A).

Prior to 2005, the IDEA did not include a statute of limitations for bringing claims, so

courts applied the analogous state statute of limitations. <u>M.D. v. Southington Bd. of Educ.</u>, 334

F.3d 217, 221-22 (2d Cir. 2003). In New York, courts generally applied a one-year statute of

limitations. <u>Somoza</u>, 538 F.3d at 114 n.7. Under amendments to the IDEA that took effect in July

2005, parents must request an impartial due process hearing "within 2 years of the date the

parent . . . knew or should have known about the alleged action that forms the basis of the

complaint." 20 U.S.C. § 1415(f)(3)(C). New York state law was subsequently amended to

include a two-year statute of limitations as well. N.Y. Educ. Law § 4401(1)(a). The IDEA creates

two tolling exceptions to the two-year statute of limitations. A claim will not be considered time-

barred if "the parent was prevented from requesting the hearing due to (i) specific

misrepresentations by the local educational agency that it had resolved the problem forming the

basis of the complaint; or (ii) the local educational agency's withholding of information from the

parent" that is required to be provided under the IDEA. 20 U.S.C. § 1415(f)(3)(D).

**B.      Section 504**

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall,

solely by reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance." 29 U.S.C. § 794(a). In the educational context, Section 504 imposes

requirements on schools that are parallel to the IDEA requirements. The statute mandates that

public elementary and secondary schools "provide a free appropriate public education" to

the appropriateness of such placement." N.Y. Education Law § 4404(1)(c).

qualified disabled students, including "regular or special education and related aids and services." 34 C.F.R. § 104.33(a) and (b). However, the two statutes provide different protections, because "Section 504 provides relief from discrimination, whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination." Wenger v. Canastota Cent. Sch. Dist., 979 F. Supp. 147, 152 (N.D.N.Y. 1997), aff'd, 208 F.3d 204 (2d Cir. 2000). Accordingly, in order to establish liability under Section 504, "courts have held that a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP." R.B. ex rel. L.B. v. Bd. of Educ. of City of N.Y., 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000). Rather, "there must be evidence that a school district acted with deliberate or reckless indifference to the student's federally protected rights or with bad faith or gross misjudgment." Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010) (internal quotation marks omitted); accord Scaggs v. N.Y. Dep't of Educ., No. 06-CV-0799 (JFB)(VVP), 2007 WL 1456221, at *15 (E.D.N.Y. May 16, 2007).

All actions under Section 504 "are governed by the state statute of limitations applicable to personal injury actions." M.D., 334 F.3d at 224 (quoting Morse v. Univ. of Vt., 973 F.2d 122, 127 (2d Cir. 1992)). In New York, the applicable statute of limitations is three years. Piazza v. Florida Union Free Sch. Dist., 777 F. Supp. 2d 669, 687 (S.D.N.Y. 2011); Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist., No. 07-CV-8828 (KMK), 2009 WL 3151200, at *8 (S.D.N.Y. Sept. 29, 2009).[4] This three-year statute of limitations "begins to run at the time that a

---

[4] The IHO applied a three-year statute of limitations to plaintiff's Section 504 claims. In their initial brief on this motion, defendants did not contest that a three-year statute of limitations applies to these claims. In their reply brief, defendants argue for the first time that a footnote in Somoza, 538 F.3d at 114 n.7, requires the court to apply a two-year statute of limitations to Section 504 claims that arise in the educational context. Defs.' Reply Mem. of Law ("Defs.' Reply"), Dkt. #63, at 26-27. I decline to consider an argument raised for the first time in a reply brief. In any event, this argument would be unavailing. The Second Circuit's analysis in Somoza related only to the statute of limitations for IDEA claims, since the plaintiff in that case did not assert Section 504 claims. In M.D., by contrast, the plaintiff brought both IDEA and Section 504 claims regarding her educational services. The Second Circuit applied a two-year statute of limitations to the IDEA claims and a three-year statute of limitations to the Section 504

plaintiff learns or has reason to learn of the injuries that form the basis for his claim." <u>Scaggs</u>, 2007 WL 1456221, at *10.

### C.     Section 1983

Section 1983 creates a civil remedy against any person who, acting under color of state law, subjects the plaintiff to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The statute of limitations for a Section 1983 claim in New York is three years, and "[t]he claim accrues when the plaintiff knows or has reason to know of the harm." <u>Eagleston v. Guido</u>, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks omitted); <u>see also</u> <u>Singleton v. City of N.Y.</u>, 632 F.2d 185, 192 (2d Cir. 1980) ("The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action.").

## II.     Plaintiff's Educational History

The record in this case is voluminous. Defendants have filed the administrative record, including transcripts of the fifteen-day hearing before the IHO and dozens of exhibits submitted by each side at the hearing.[5] Plaintiff has also submitted an additional twenty-eight documents totaling over 1,000 pages. Despite the size of the record, however, it is impossible to reconstruct all of the details of K.H.'s educational history. The hearing exhibits include school records dating back to the 1990s that contain significant gaps and inconsistencies. Moreover, plaintiff

---

claims. 334 F.3d at 222, 224. Cases decided after <u>Somoza</u> addressing Section 504 claims in the educational context, including <u>Piazza</u> and <u>Pape</u>, have continued to apply a three-year limitations period. Accordingly, I see no reason to conclude that the cited footnote in <u>Somoza</u> altered the governing Second Circuit precedent, and I will apply a three-year limitations period to plaintiff's Section 504 claims.
[5] Pursuant to court order, Dkt. #40, defendants have filed the administrative record under seal to protect the privacy of plaintiff, who was a minor during the years in question. The transcript of the hearing will be cited as "Tr." Exhibits introduced by plaintiff at the hearing will be cited as "Pl.'s Hr'g Ex. __," exhibits introduced by defendants at the hearing will be cited as "Defs.' Hr'g Ex. __," and exhibits entered into evidence by the IHO at the hearing will be cited as "IHO Hr'g Ex. __." The IHO and SRO decisions will be cited as "IHO Decision" and "SRO Decision," respectively, and plaintiff's appeal to the SRO will be cited as "Pl.'s SRO Petition."

has raised numerous objections to defendants' reliance on the school records for their substantive content. Plaintiff asserts that the records contain unattributed and hearsay statements, are incomplete, or are not in evidentiary form. Pl.'s Resp. to Defs.' Rule 56.1 Statement ("Pl.'s Rule 56.1 Resp."), Dkt. #61, at 2.[6] At this stage, however, the only issue before the court is the timeliness of plaintiff's claims. In order to determine when plaintiff was on notice of his claims, I must consider what was reported about plaintiff's needs and academic performance throughout his educational career, but I make no findings about the accuracy of the information contained in those reports. Mindful of the evidentiary limitations of the documents in the record, I will summarize the facts that are undisputed and the information from plaintiff's school records that is relevant to deciding the narrow statute of limitations issue that is now before me.

K.H. was born in 1989 and lived with his mother until he was two years old. Defs.' Rule 56.1 Statement of Undisputed Facts ("Defs.' Rule 56.1 Statement"), Dkt. #47, Ex. 2, ¶¶ 14-15. In 1991, after K.H.'s younger brother tested positive for cocaine at birth, K.H. was removed from his mother's custody and began to reside in kinship foster care with his grandmother. Id. ¶ 15; Pl.'s Rule 56.1 Resp. ¶ 15. K.H.'s mother regained custody of K.H. in early 1999. Defs.' Rule 56.1 Statement ¶ 43.

K.H. received special education services through the DOE beginning in preschool, when he was placed in a special education class at the Birch Early Childhood Center. Defs.' Rule 56.1

[6] Plaintiff also asserts that defendants should not be able to rely on many of the hearing exhibits for their substantive content because they were introduced for only a limited purpose at the hearing. Pl.'s Rule 56.1 Resp. 2. On the eleventh day of the impartial hearing, plaintiff objected to the DOE's reliance on certain school records that had been introduced into evidence. Tr. 1981-92. The DOE attorney responded that the "only reason" the documents were being introduced into evidence was to demonstrate K.H.'s mother's and grandmother's attendance at school meetings. Tr. 1989. The DOE attorney stated that the DOE was "not relying on the substance" of these school records. Id. In the briefing of the instant motion, defendants argue that the DOE attorney's statement at the hearing was erroneous and "overstated the limit on the evidentiary value of the exhibits, which were relevant to multiple issues concerning the statute of limitations." Defs.' Reply 21. In any event, I agree with defendants that because plaintiff repeatedly cited these exhibits for their substantive content in his post-trial memorandum to the IHO and on appeal to the SRO, and because plaintiff never previously objected to the IHO's and SRO's reliance on these exhibits for their substantive content, plaintiff has waived any objection to the use of these exhibits for their substantive content on this motion. Id. at 20-24.

Statement ¶ 17.  An evaluation from 1993 stated that K.H. functioned in the "low average range of intelligence" and exhibited "moderate speech and language delays," with "difficulties in maintaining attention and concentration." Pl.'s Hr'g Ex. UU at 3. K.H. also had a history of ear infections, "mild to moderate hearing loss" in each ear, and strabismus, or improper alignment, of his left eye. Defs.' Rule 56.1 Statement ¶ 22; Defs.' Hr'g Ex. 22 at 3; Pl.'s Hr'g Ex. SS. An evaluation from 1994, when K.H. was 5 years old, reported that his "intellectual functioning was found to be within the low average range with indications of greater potential" and that he needed "part-time intervention" to address speech and language delays. Pl.'s Hr'g Ex. TT at 4.

In 1994, K.H. entered kindergarten at P.S. 140 in Queens. Defs.' Rule 56.1 Statement ¶ 23. K.H.'s first school-age IEP, dated May 26, 1994, classified K.H. as "Learning Disabled" and recommended a special class with related services. Defs.' Hr'g Ex. 2. K.H.'s grandmother signed the attendance page for this IEP conference. Id. at 2. Subsequent IEPs dated November 15, 1994, October 17, 1995, and April 30, 1996 recommended the same program, and K.H.'s grandmother signed the attendance pages for these three conferences. Defs.' Hr'g Exs. 3-5.

K.H.'s school records reported that he exhibited serious academic and behavioral challenges in this setting. In October 1996, the DOE conducted an educational evaluation that found that K.H. had made "[l]ittle or no progress" in reading or math and displayed "significant behavioral difficulties" that interfered with his learning. Defs.' Hr'g Ex. 33 at 5. A "Social History Update" dated October 15, 1996 noted that K.H. was "constantly in trouble," was "essentially a non-reader," and acted "aggressively all day long." Defs.' Hr'g Ex. 19. The report stated that K.H.'s grandmother was "aware of his academic/behavioral problems" and was "in agreement that he requires a class with more adult supervision to help address his problems." Id.

At an IEP meeting on October 28, 1996, the DOE changed K.H.'s classification to

"Emotionally Disturbed," the classification that he would be given for the remainder of his time in the New York City public schools. Defs.' Hr'g Ex. 6. Over the next few years, K.H. attended various placements in District 75, the citywide district that provides "highly specialized instructional support . . . for students with significant challenges." Decl. of Elisa Hyman ("Hyman Decl."), Dkt. #59, Ex. U. His school records consistently reported a lack of academic progress in each of these settings.

At the IEP meeting on October 28, 1996, the DOE recommended that K.H. be placed in a "Specialized Instructional Environment VIIA" with related services. Defs.' Hr'g Ex. 6. Under the DOE's continuum of special education services that was in place at the time, a Specialized Instructional Environment VII was designed for "students with severe emotional disturbance." Hyman Decl., Ex. D, at D 002656. K.H.'s grandmother signed the attendance page for the October 28, 1996 IEP conference, Defs.' Hr'g Ex. 6 at 2, and signed a form consenting to the recommendation, Defs.' Hr'g Ex. 29.

In 1998, when K.H. was nine years old, the DOE moved him to a program for students with intellectual disabilities. An evaluation dated July 16, 1998 found that K.H. performed within the "Mentally Retarded range of intelligence overall" with a score of 61. Defs.' Hr'g Ex. 34 at 2. A "Social Update" dated July 21, 1998 stated that K.H.'s grandmother "feels that his teachers do not understand him" and that "his behavior is due to his frustrations and embarrassment about not being able to read." Defs.' Hr'g Ex. 20 at 2. In an IEP dated August 10, 1998, the DOE changed K.H.'s service category to "Specialized Instructional Environment VI," designed for students who "demonstrate severe emotional/behavioral disturbance [and] function in the retarded range." Defs.' Hr'g Ex. 7; Hyman Decl., Ex. D, at D 002650. K.H.'s grandmother signed the attendance page for this IEP conference. Defs.' Hr'g Ex. 7 at 2.

A year later, the DOE again recommended that K.H. needed a different setting. A "Psychological Evaluation" on May 28, 1999, when K.H. was 10 years old, stated that his classwork was "too difficult" for him, "which caused a great deal of frustration and combined with emotional factors contributed to increasing behavioral problems." Defs.' Hr'g Ex. 35 at 3. A "Psychiatric Report" dated June 14, 1999 stated that K.H. was "extremely difficult to contain in his current program." Defs.' Hr'g Ex. 36 at 1. The report stated that "overall IQ appeared in the borderline range" and that K.H.'s "severe behavioral disturbance in school" might be attributable to "a history of in utero drug exposure as well as other dynamic factors that may have played a role in his early development." Id. at 2-3. The report listed a "DSM IV Diagnosis" of "Attention-Deficit Hyperactivity Disorder (severe)" and "Borderline IQ" and proposed that a "Learning Disorder" be ruled out. Id. at 3. The report recommended "a more restrictive therapeutic setting." Id. A "Social Update Format" dated June 16, 1999 stated that his mother "acknowledges all of the problems that have been enumerated by school staff in terms of his effort in academics and his poor behavior." Defs.' Hr'g Ex. 21 at 2. The report stated that K.H.'s mother "patiently listened" to all of his teachers describe his difficulties and that "[h]er silence indicated that she seems to agree that [K.H.]'s needs can no longer be met in this setting." Id.

Soon afterward, in late June 1999, K.H. was admitted for two weeks to Schneider Children's Hospital and placed on medication. Defs.' Rule 56.1 Statement ¶ 50. An IEP dated July 8, 1999 recommended that K.H. return to the Specialized Instructional Environment VII setting. Id. ¶ 51. K.H.'s mother signed the attendance page for the IEP. Defs.' Hr'g Ex. 9 at 2. A "Psychiatric Evaluation" by Queens Children's Psychiatric Center dated September 22, 1999 continued to list a diagnosis for K.H. of "Mental Retardation, Mild in Severity," along with "Attention Deficit Hyperactivity Disorder, Combined type" and "Oppositional Defiant

Disorder." Defs.' Hr'g Ex. 37 at 5.

In October 1999, when K.H. was 10 years old, he began attending the Dooher Unit, a day treatment program at the Queens Children's Psychiatric Center. Defs.' Rule 56.1 Statement ¶ 58. In December 1999, K.H.'s mother wrote a letter to the DOE requesting a re-evaluation of K.H. and stating that she wanted him to be placed in "another school" rather than Dooher. Defs.' Ex. D 000001. A "Psychological Evaluation" dated February 29, 2000 by Queens Children's Psychiatric Center found that K.H. demonstrated a Full Scale IQ of 74, which placed "his overall cognitive abilities . . . in the borderline range of intelligence," and removed his prior diagnosis of "mild mental retardation." Defs.' Hr'g Ex. 38 at 5. The evaluator found that K.H.'s academic performance was "significantly below grade level in all academic areas, indicating the presence of functional learning disabilities." Id. at 6. The evaluator recommended a "stable, structured environment that can meet the needs of a child with neurocognitive impairment, language deficits, attention deficits, and behavioral difficulties." Id. at 9. In a report dated May 11, 2000, the Dooher team stated that K.H.'s aggressive and oppositional behavior had decreased in the day treatment program but that he had shown "[l]ittle improvement in academic performance." Pl.'s Hr'g Ex. QQ. The Dooher team recommended that K.H. return to a less restrictive environment. Defs.' Rule 56.1 Statement ¶ 69. An IEP dated June 22, 2000 changed K.H.'s placement back to a Specialized Instructional Environment VIIB program. Defs.' Hr'g Ex. 10. K.H.'s mother signed the attendance page for this IEP conference, id. at 2, and signed a form consenting to the change in placement, Defs.' Hr'g Ex. 25.

In September 2000, the DOE assigned K.H. to P.S. 9, a District 75 middle school in Queens, which he attended until September 2005. Defs.' Rule 56.1 Statement ¶ 74. K.H.'s mother signed the attendance pages for IEP meetings in 2001 and 2002 that recommended a

special class in a specialized District 75 school with related services. Defs.' Hr'g Exs. 12 & 13. The record does not show that either K.H.'s mother or grandmother attended any subsequent IEP meetings.

K.H.'s school records from his years at P.S. 9 reported ongoing concerns about his lack of progress and continuing inability to read. A "Social History Update" dated January 30, 2003 stated that K.H.'s mother "described [K.H.]'s academic performance as 'very poor'" and was "aware that he does not read and struggles with all aspects of language development." Defs.' Hr'g Ex. 23 at 2. The report stated that his mother "believes that [K.H.]'s current placement has been helpful to him" because his behavior had improved and that she wanted him "to learn how to read." Id. at 3. In a "Psychological Report" dated February 28, 2003, the evaluator found that K.H. had a full scale IQ of 76, "placing his overall level of functioning to be within the 'Borderline' range of intelligence." Defs.' Hr'g Ex. 39 at 3. The evaluator stated that K.H.'s "academic skills remain significantly delayed and he continues to display behavioral difficulties and limited self-control." Id. at 4-5. In an "Educational Evaluation Report" dated February 24, 2003, the evaluator stated that K.H. was a "non-reader" who had "limited decoding skills and no sight word vocabulary," made "multiple decoding errors suggesting problems with visual perception of letters," and had a "severe case of strabismus in both eyes." Pl.'s Hr'g Ex. OO at 2. The evaluation recommended "direct instruction in phonological awareness skills." Id. at 3. At an IEP conference on March 14, 2003, which K.H.'s mother did not attend, the team made no changes to K.H.'s special education services. Defs.' Hr'g Ex. 14.

In the fall of 2004, K.H.'s teacher at P.S. 9 recommended a change in placement for K.H. Defs.' Hr'g Ex. 16. His teacher wrote that K.H. "has not made any growth academically" and was 15 years old in the seventh grade, with reading and writing at a beginning first grade level

and math at a beginning third grade level. Id. His teacher wrote that K.H. showed "no success in standardized testing, which frustrates him affecting his morale and self-esteem." Id. He recommended that K.H. transfer to a vocational high school that participated in alternate assessment where he would "feel more successful" and "school would become a more positive experience for him." Id. According to the New York State Education Department, alternate assessment is a portfolio-based method of measuring student achievement as an alternative to standardized testing. Pl.'s Hr'g Ex. AAAA at 2. Alternate assessment is intended for a student who has "a severe cognitive disability" and "significant deficits" in language and adaptive behavior and requires a "highly specialized educational program" and "educational support systems." Id. at 3. K.H.'s mother signed a form indicating that she attended a conference on December 21, 2004 regarding the proposed change to alternate assessment. Defs.' Hr'g Ex. 16. On January 18, 2005, K.H.'s mother signed a form giving consent for new evaluations of K.H. Defs.' Hr'g Ex. 24. In a "Psychoeducational Evaluation" dated March 14, 2005, the evaluator found that K.H. obtained a Full Scale IQ score of 84, falling in the "low average range," while his academic skills were in the "very low range." Defs.' Hr'g Ex. 40 at 3-4. An IEP dated April 15, 2005 changed K.H.'s recommendation from Standard Assessment to Alternate Assessment. Defs.' Hr'g Ex. 56. K.H.'s mother did not attend this IEP conference, but K.H. attended. Id.[7] The record includes a form dated April 15, 2005 seeking consent to the change to alternate assessment, which is not signed by the parent, Defs.' Hr'g Ex. 54, though K.H.'s mother did sign several other DOE forms in the fall of 2005, Defs.' Hr'g Exs. 49-50, 60-61, 63.

In September 2005, K.H. transferred from P.S. 9 to the alternate assessment program at the Queens School for Career Development ("QSCD"). Defs.' Rule 56.1 Statement ¶ 98. He

---

[7] Plaintiff argues that his signature on the IEP's attendance page does not indicate that he was aware he was signing an IEP, since he could not read at the time of the meeting. Pl.'s Rule 56.1 Resp. ¶ 94.

exhibited serious ongoing attendance problems at QSCD. Id. ¶ 104. An IEP dated March 10, 2006, stated that K.H. "doesn't attend school on a regular basis." Defs.' Hr'g Ex. 57 at 5. Neither K.H., his mother, nor his grandmother signed the attendance page for that IEP. Id. On December 9, 2008, when K.H. was 19 years old, QSCD sent a letter to K.H.'s mother stating that a conference would be held because K.H. had been absent for more than twenty days. Defs.' Hr'g Ex. 47.[8] In a letter dated January 30, 2009, QSCD stated that K.H.'s mother did not attend the conference and that "a decision was made that your child will be discharged from school." Defs.' Hr'g Ex. 48. The letter stated that if K.H.'s mother did not contact the school by February 13, 2009, and if K.H. continued to be absent from school, he would be discharged. Id. A DOE form signed by school officials in the spring of 2009 stated that K.H. was discharged effective September 2, 2008, the previous fall. Defs.' Hr'g Ex. 45 at 2. The DOE did not prepare IEPs for K.H. after his discharge from QSCD. Defs.' Rule 56.1 Statement ¶ 110.

Sometime around 2009, plaintiff saw a television advertisement for the Huntington Learning Center and contacted them to ask about their tutoring services because he wanted to "learn and master the skill of reading and writing." Tr. 2224-26. When plaintiff was unable to afford the center's rates, the center referred him to his attorney. Id.

In May 2010, when plaintiff was 21 years old, he underwent a "Neuropsychological Evaluation" by Dr. Eugene Newman. Pl.'s Hr'g Ex. S.[9] The evaluation stated that K.H. exhibited a Full Scale IQ of 75, placing him in the borderline level just below the low average level, but

---

[8] Plaintiff disputes that K.H.'s mother received the letters from QSCD regarding K.H.'s attendance. Plaintiff asserts that the record does not show any proof that the letters were mailed, or what addresses they were sent to, and also states that K.H. was living in a homeless shelter in the fall of 2008. Pl.'s Rule 56.1 Resp. ¶¶ 105-06, 108.

[9] The evaluation report states that the evaluation was conducted in May 2010 and January 2011. However, in his due process complaint filed in June 2010, plaintiff stated that he had obtained a neuropsychological evaluation that identified learning disabilities. Therefore, Newman must have provided K.H. with information about the testing results and diagnoses in May 2010, even if other testing was evidently done in January 2011 and the report was completed later. Newman also completed a "Cognitive and Educational Evaluation" in May 2010 stating that K.H. had "negligible" academic skills and "very low" achievement in reading and math. Pl.'s Hr'g Ex. WW at 4.

that other test results suggested that K.H. had "at least low average cognitive skills or potential." Id. at 25. Dr. Newman found that the testing revealed a "clear pattern" that explained K.H.'s long history of academic difficulties: "a combination of auditory processing difficulties combined with marked difficulties with immediate memory, of both verbal and visual material." Id. at 26. Based on this testing, Dr. Newman concluded, "The overall picture clearly shows that [K.H.]'s achievement skills are a very low estimate of his potential functioning and that if accommodations are made for his particular learning style, that he can show dramatic increases in all academic areas." Id. at 27. Dr. Newman diagnosed K.H. with dyslexia, dysgraphia, dyscalculia, and difficulties with memory, processing speed, concept formation, and problem solving. Id. at 27-29. Dr. Newman's report listed "DSM IV Diagnoses" of "Learning Disorder, NOS," "Mixed Receptive-Expressive Communication Disorder," and "Cognitive Disorder NOS." Id. at 29.

III.    **Procedural History**

 A. **Impartial Hearing**

On June 3, 2010, a few weeks after K.H. turned 21, he filed a due process complaint bringing claims under the IDEA, Section 504, Section 1983, and New York state law. Defs.' Hr'g Ex. 1. The complaint asserted that "[e]very IEP and placement developed for [K.H.] during the time he was eligible for public education in New York was substantively and procedurally flawed, did not comport with the standards of the [IDEA] or state law, and resulted in a significant deprivation of educational benefit and deprivation of" a free appropriate public education. Id. ¶ 23. Among the allegations, plaintiff asserted that the DOE conducted inadequate evaluations of K.H., created IEPs that "failed to accurately describe and address all of his

disabilities and diagnoses," and failed to ensure that K.H.'s mother and grandmother had "meaningful access" to the IEP development process or "legally sufficient notice of meetings." Id. The complaint alleged that the DOE "employed inflexible blanket policies for special education services and placement and warehoused [K.H.] year after year, in essentially the same program, despite no progress." Id. ¶ 27. The complaint also alleged that the DOE's referral of K.H. to District 75 programs for students classified as "Emotionally Disturbed" was "part of an illegal pattern and practice of referring Black males to District 75 special education programs" and that these programs "do not have equivalent educational services as those services available to students who do not have disabilities." Id. ¶¶ 29-30. The complaint also challenged the DOE's failure to address K.H.'s truancy at QSCD and asserted that K.H.'s discharge was improper. Id. ¶¶ 32-38. The complaint alleged that K.H. had obtained recent evaluations identifying learning disabilities, speech and language delays, and vision difficulties that had never been identified or addressed by the DOE. Id. ¶¶ 48-50. As remedies, K.H. sought, inter alia, compensatory education and services, including intensive individual tutoring focusing on GED preparation, transition services with vocational training, speech and language services, occupational therapy, assistive technology, counseling, and transportation; reimbursement for the evaluations that he had already obtained; additional evaluations; damages; and attorney's fees. Id. ¶ 56.

The DOE filed a motion to dismiss the majority of K.H.'s claims as time-barred under the applicable statutes of limitations. IHO Hr'g Ex. VI. At the hearing, the DOE did not dispute that K.H.'s IDEA claims regarding the 2008-09 and 2009-10 school years were timely, since they fell within the two-year period before K.H. filed his due process complaint. Tr. 315-16. The DOE conceded that it had not provided a free appropriate public education to K.H. during those two years, so the only remaining issue regarding those two years was the appropriate remedy. Id. at

336. On the record, over K.H.'s objections, the IHO dismissed as time-barred any IDEA claims prior to the 2005-06 school year and any Section 504 claims prior to the 2007-08 school year. Id. at 310, 325. The IHO also dismissed on the record any IDEA or Section 504 claims that alleged systemic challenges rather than challenges to K.H.'s individual educational program. Id. at 1783-87. The parties' lengthy discussion of the statute of limitations at the hearing focused on K.H.'s individual IDEA claims regarding the 2005-06, 2006-07, and 2007-08 school years. The IHO ruled that she would hear evidence regarding the application of the statute of limitations to these claims and then determine whether they were time-barred. Id. at 310-17.

The impartial hearing occurred over fifteen non-consecutive days between August 16, 2010 and June 22, 2011. While the hearing was pending, the IHO ordered additional evaluations of K.H. An occupational therapy evaluation in September 2010 recommended occupational therapy due to K.H.'s difficulties with reading, writing, visual motor tasks, and life skills. Pl.'s Hr'g Ex. K. An Auditory Processing Evaluation by Donna Geffner in October 2010 found that K.H. had an auditory processing disorder and a phonological processing disorder underlying a reading disability and recommended speech-language therapy. Pl.'s Hr'g Ex. J. Geffner also conducted a Language Processing Evaluation in November 2010 that found that K.H. had a "severe receptive and expressive language disorder." Pl.'s Hr'g Ex. Q at 6.

Following the conclusion of the hearing, the IHO issued a decision on August 17, 2011 finding that K.H.'s claims for the 2005-06, 2006-07, and 2007-08 school years were time-barred.[10] The IHO determined that K.H.'s mother was on notice of her rights because "[t]he DOE documented a history of parental involvement in IEP meetings, each of which advised her of her due process rights." IHO Decision, Dkt. #6, Ex. 1, at 12. The IHO found that plaintiff could not invoke the tolling exception based on a misrepresentation by the DOE because "the

---

[10] The IHO issued a corrected decision on September 21, 2011 that only made changes to the list of exhibits.

record contains no evidence that the DOE was anything but forthright about why it sought to have [K.H.] included in alternative assessment." <u>Id.</u> The IHO also rejected K.H.'s argument that his claims based on the failure to identify his learning disabilities did not accrue until 2010, when Dr. Newman assessed him. Instead, the IHO found that "K.H.'s records show a consistent history of learning-based difficulties" and "significant behavioral issues," so Dr. Newman's diagnosis of dyslexia in 2010 did not establish that K.H.'s "educational classification of emotional disturbance was incorrect" or that "the DOE ignored the student's learning disability." <u>Id.</u> The IHO also found that K.H.'s mother should have known about his truancy problems in 2006-07 and 2007-08 because "the parent was involved in K.H.'s education at the time." <u>Id.</u> at 13. Overall, the IHO found that neither tolling exception applied and that K.H.'s mother "knew or should have known of the events that took place" in the 2005-06, 2006-07, and 2007-08 school years, so the claims for those years were time-barred. <u>Id.</u>

The IHO dismissed all of K.H.'s Section 504 claims for 2007 through 2010 on the merits, having already dismissed all of his Section 504 claims prior to 2007 as time-barred. The IHO found that the DOE failed to comply with procedural safeguards when QSCD discharged K.H. in 2008, but no evidence showed that the DOE discriminated against K.H. based on his disability or acted with "bad faith or gross misjudgment." <u>Id.</u> at 68. The IHO also dismissed all of K.H.'s Section 1983 claims, holding that she did not have jurisdiction over them. <u>Id.</u> at 71-72.

Therefore, the IHO only had to address remedies for K.H.'s remaining IDEA claims for the 2008-09 and 2009-10 school years. The DOE had conceded that it failed to provide a free appropriate public education during those years, and the IHO found that K.H. was eligible for compensatory services, with a focus on "learning to read competently, followed by appropriate vocational training." <u>Id.</u> at 51. The IHO awarded K.H. 480 hours of individual reading

instruction and 19.5 hours of individual speech therapy over a six-month period. Id. at 52. At the end of that period, if an independent evaluation showed that K.H. had "objectively made progress," he would receive another 480 hours of reading instruction and 19.5 hours of speech therapy. Id. at 53. The IHO also ordered the DOE to provide K.H. with a vocational assessment, transition counseling, assistive technology, and transportation to his services. Id. at 53-54.

**B.     SRO Appeal**

In September 2011, plaintiff brought a partial appeal before the SRO. Plaintiff sought additional compensatory services, including math instruction, occupational therapy, and additional reading instruction and speech therapy. Pl.'s SRO Pet. ¶¶ 67-72. Plaintiff also appealed the denial of his Section 504 claims, Section 1983 claims, and systemic claims, and he appealed the IHO's ruling that his IDEA claims for the years before 2008-09 and his Section 504 claims for the years before 2007-08 were time-barred. Id. ¶¶ 78-102. As a remedy, plaintiff sought an additional 1,155 hours of tutoring for each additional school year for which the statute of limitations was not deemed a defense, until either plaintiff could not make any more progress or he reached a level where he could take state testing with accommodations. Id. ¶ 113. Plaintiff also sought other remedies including additional services, assistive technology, and payment for evaluations. Id. Defendants did not file a cross-appeal on any issues. Def.'s Rule 56.1 Statement ¶ 118.

In a decision issued on December 5, 2011, the SRO upheld the IHO's rulings on the statute of limitations. The SRO found that the DOE met its burden of establishing that any IDEA claims prior to the 2008-09 school year were time-barred. SRO Decision, Dkt. #6, Ex. 2, at 10. For the years between 1996 and 2003, the record showed that K.H.'s mother and grandmother were aware of his difficulties in school and were present at IEP meetings where the team

discussed his lack of progress, so K.H.'s mother "knew or should have known of any deficiencies in the student's IEPs at the time they were developed." Id. at 11. For the years between 2003-04 and 2006-07, the record showed that IEPs were mailed to the mother, that she attended a conference to discuss the switch to alternate assessment, and that the DOE made attempts to reach her by mail and telephone. Id. For the 2007-08 school year, the DOE did not enter an IEP into evidence, but K.H.'s mother should have been aware of the annual IEP review process, so she should have known that she had a claim if the DOE failed to develop an IEP. Id. at 11-12. The SRO also rejected K.H.'s argument that his claims regarding his misdiagnosis and improper classification did not accrue until he got Dr. Newman's evaluation in 2010. Instead, the SRO found that "the district acknowledged the deficits of which the student now complains, repeatedly and over a period of years." Id. at 12. The SRO stated that K.H.'s inability to read was noted in the record starting in 1996, and the evaluation from 2000 referenced his difficulty with auditory processing and language, so his mother knew or should have known "of the student's difficulties with auditory processing and reading" at the time those IEPs were made or shortly after. Id. The SRO also held that neither tolling exception to the IDEA's statute of limitations applied to plaintiff's case. The evidence did not show that the DOE misrepresented to K.H.'s parent that it had resolved the problem. Id. at 13. As to the second tolling exception, the record showed that the DOE had not provided all of the required notices to the parent, but "the parent was not prevented from requesting an impartial hearing" because of the DOE's failure to provide the notices. Id. at 13-14.

The SRO also held that he had no jurisdiction to address plaintiff's Section 1983 claims or to review the IHO's denial of plaintiff's Section 504 claims. Id. at 8-9. The SRO largely upheld the IHO's award of compensatory education, though he added math tutoring and

occupational therapy and increased the award of speech therapy. Id. at 15-22.

### C.   Plaintiff's Compensatory Services

Plaintiff has submitted two declarations regarding his progress with the compensatory services that he received under the IHO and SRO decisions. In March 2012, after plaintiff completed the first 480 hours of reading instruction, Dr. Newman conducted updated testing. Decl. of Eugene Newman ¶ 2. The testing showed that K.H. had made "very dramatic improvement in both decoding and word attack skills," while his reading comprehension, reading fluency, and spelling improved "modestly." Id., Ex. A, at 2-4. Newman stated that K.H. would benefit from continued intensive reading instruction and that he "urgently needed" speech and language therapy. Id., Ex. A, at 5.

Cara Nemchek, the Center Director of Lindamood-Bell Learning Processes in Manhattan, stated that Lindamood-Bell provided 793 hours of one-on-one reading instruction to K.H. under the SRO and IHO orders. Decl. of Cara Nemchek ¶ 7. The orders provided for 960 hours in total, but those hours could not all be completed within the allotted time period. Id. ¶ 7. Lindamood-Bell tested K.H. originally in April 2010, again when he started services in September 2011, and again in July 2013 after he received 793 hours of instruction. Id. ¶¶ 5-6, 10. Nemchek stated that the tests showed that K.H. made progress in listening comprehension, verbal expression, sounding out words, word recognition, word reading, reading fluency, reading comprehension, phoneme awareness, and orthographic processing. Id. ¶¶ 14-20. Nemchek asserted that the evaluations showed that K.H. still had areas where he needed to improve, and he "still demonstrate[d] capacity to make progress in reading." Id. ¶ 22. Before K.H. started the instruction, Lindamood-Bell estimated that K.H. would need 1,000-1,500 hours to reach a high school level in reading and vocabulary, but Nemchek stated that his rate of progress

demonstrated that he would need more hours than that. Id. ¶ 23.

**D.     District Court Suit**

On April 5, 2012, plaintiff filed the instant suit bringing claims under Section 1983, the IDEA and its regulations, the Due Process Clause of the U.S. Constitution, the New York state constitution, Section 504 and its regulations, and New York state law. In his First Amended Complaint filed on May 9, 2012, plaintiff asserts, among other claims, that the IHO's compensatory education order was inadequate because the IHO erroneously found that its purpose was to help K.H. reach a functional reading level and receive vocational training, rather than preparing him to receive a high school diploma. Am. Compl., Dkt. #6, ¶¶ 392-402. Plaintiff also asserts that the SRO's compensatory education ruling was inadequate because it arbitrarily ignored the recommendations of experts about how many hours of services K.H. should receive. Id. ¶¶ 503-21. In addition, plaintiff asserts that the DOE violated the IDEA by failing to fully and timely implement the compensatory education orders. Id. ¶¶ 538-62, 612.

Plaintiff also asserts in his complaint that the court should not give deference to the decisions of the IHO and SRO or remand any issues back to either one. Plaintiff alleges that "there are infirmities in the due process system" for hearing IDEA and Section 504 claims "that cause impermissible conflicts of interest on the part of the fact-finders." Id. ¶ 589. Specifically, plaintiff contends, inter alia, that the SRO is an employee of the New York State Education Department and that the SRO has financial power over IHOs. Id. ¶¶ 588-608.

Plaintiff asserts numerous individual IDEA claims in his complaint, including: (a) failing to provide K.H. a free appropriate public education during the years in question; (b) failing to adequately evaluate and re-evaluate K.H.; (c) failing to identify K.H.'s diagnoses of dyslexia, dyscalculia, dysgraphia, and auditory processing disorder; (d) failing to develop procedurally and

substantively valid IEPs; (e) failing to ensure meaningful parental participation; (f) failing to render individualized decisions about K.H.'s education; (g) making decisions about K.H.'s education based on "his classification, blanket policies, administrative concerns, and resources"; (h) failing to ensure K.H. had access to the general education curriculum; (i) failing to provide education to K.H. in the least restrictive environment; (j) failing to give K.H., his mother, and guardian the required IDEA protections; (k) failing to follow procedural requirements for placement decisions; (l) failing to adequately classify K.H.; (m) wrongly placing K.H. on an alternate assessment track; (n) improperly discharging K.H. from school; (o) warehousing K.H. in legally inadequate programs; (p) failing to address K.H.'s attendance problems and make necessary changes to his special education services to address his attendance; (q) failing to conduct a functional behavioral analysis and provide behavioral supports; (r) failing to ensure that K.H. met his IEP goals; (s) failing to maintain adequate records of K.H.'s educational services and afford access to those records; (t) failing to implement provisions of the IHO order; and (u) subjecting K.H. to due process administrative procedures that violated due process, the IDEA, and Section 504. Id. ¶ 610.

Plaintiff also asserts systemic claims, alleging that the DOE violated the IDEA "by failing to adopt and implement adequate policies and procedures, by failing to train and supervise their staff to ensure that students' [IDEA] rights to FAPE and due process were protected, and by committing . . . systemic violations of the law." Id. ¶ 611.

In addition, plaintiff asserts claims under Section 1983 regarding the DOE's failure to implement adequate policies, training, and oversight to ensure compliance with the IDEA, New York state law, and Section 504; the DOE's failure to timely implement orders of the IHO and SRO; and the DOE's discharge of K.H. without due process. Id. ¶¶ 613-19. Plaintiff asserts

individual and systemic claims under Section 504, alleging, <u>inter alia</u>, that the DOE discriminated against K.H. on the basis of his disability by "maintaining him in District 75 programs that do not afford students with disabilities equal opportunity for benefit and outcomes as do programs for children without disabilities." <u>Id.</u> ¶¶ 620-27. Plaintiff also asserts various claims under New York state law and the New York state constitution. <u>Id.</u> ¶¶ 628-30.

K.H. alleges that, as a result of the DOE's actions, he has suffered harm including "exclusion from education, emotional harm, loss of educational opportunity, loss of employment opportunity, injury to reputation, economic harm, and loss of income." <u>Id.</u> ¶¶ 569-73. He seeks relief including: (a) declaratory relief; (b) equitable relief in the form of additional compensatory education and services; (c) damages; (d) injunctive relief to prevent continuing harm and enforce the IHO and SRO awards; and (e) attorney's fees and costs. <u>Id.</u> ¶ 631.

At a conference before this court on September 18, 2012, the parties indicated that it would facilitate settlement discussions if the court addressed the statute of limitations issue at the outset and determined how many school years were at issue in the litigation and which school years' claims were dismissed as time-barred. The court referred the parties to Magistrate Judge Go to conduct any necessary discovery on the statute of limitations issue. Following discovery, defendants brought the instant motion for partial summary judgment on statute of limitations grounds. Dkt. #47. Defendants assert that the court should: (1) affirm the SRO's decision concerning the statute of limitations applicable to the IDEA claims; (2) affirm the IHO's decision concerning the statute of limitations applicable to the Section 504 claims; and (3) grant summary judgment dismissing some of the Section 1983 claims as time-barred. Defs.' Mem. of Law in Supp. of Mot. for Partial Summ. J., Dkt. #47, Ex. 3, at 37.

## DISCUSSION

## I.    Standard of Review

This case comes before the court on a motion for summary judgment, but the usual Rule 56 standard does not apply in the IDEA context. "[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact." <u>M.H. v. N.Y.C. Dep't of Educ.</u>, 685 F.3d 217, 225 (2d Cir. 2012) (quoting <u>Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.</u>, 397 F.3d 77, 83 n.3 (2d Cir. 2005)). Instead, a summary judgment motion in an IDEA case "serves as a pragmatic procedural mechanism for reviewing a state's compliance" with the IDEA's procedural and substantive requirements. <u>Id.</u> at 225-26. "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." <u>Id.</u> at 226 (alteration in original); <u>accord</u> <u>C.B. v. Pittsford Cent. Sch. Dist.</u>, No. 08-CV-6462 CJS (P), 2010 WL 1533392, at *13 (W.D.N.Y. Apr. 15, 2010) (for summary judgment motion on IDEA claim, "the standard is different, since the Court is reviewing the sufficiency of an administrative decision").

Under the IDEA, when a party brings a civil action to challenge an administrative decision, the court shall "receive the records of the administrative proceedings," hear additional evidence if a party requests it, and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The statute requires the district court to "engage in an independent review of the administrative record," but "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation marks omitted); <u>accord</u> <u>Grim</u>, 346 F.3d at 380-81 (stating that both the

Supreme Court and Second Circuit "have interpreted the IDEA as strictly limiting judicial review of state administrative decisions"). The Supreme Court has cautioned that the judicial review provision of the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206; accord Walczak, 142 F.3d at 129. Rather, the district court must consider only two issues: first, whether the state complied with the IDEA's procedural requirements, and second, whether the IEP developed through those procedures is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 204, 206-07.

The reviewing court must engage in a level of review that is "a more critical appraisal" than clear-error review but "falls well short of complete de novo review." M.H., 685 F.3d at 244 (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993)). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206). The Second Circuit has declined to adopt a bright-line standard for judicial review and instead has held that the "due weight" to be given to administrative determinations "will vary based on the type of determination at issue." M.H., 685 F.3d at 244.

However, the district court is not required to defer to administrative determinations regarding matters of law. "[T]he due weight we ordinarily must give to the state administrative proceedings is not implicated with respect to issues of law, such as the proper interpretation of the federal statute and its requirements." Lillbask, 397 F.3d at 82 (internal quotation marks, ellipses, and alteration omitted); accord Muller v. Comm. on Special Educ. of E. Islip Union Free

Sch. Dist., 145 F.3d 95, 102 (2d Cir. 1998) (holding that district court does not have to defer to state administrative officials on matters of statutory interpretation); Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997) (same). In this case, the issue on review is the application of the IDEA's statute of limitations. This issue requires the court to interpret the statutory provisions and the law regarding claim accrual and does not implicate educational policy decisions. "These matters fall within the purview of the lawyer's expertise, not that of the educator." E.M. v. N.Y.C. Dep't of Educ., -- F.3d --, No. 11-1427-cv, 2014 WL 3377162, at *11 (2d Cir. Jul. 11, 2014). Accordingly, I find that deference to the IHO's and SRO's rulings is not warranted in this case. See R.B. v. Dep't of Educ. of City of N.Y., No. 10 Civ. 6684(RJS), 2011 WL 4375694, at *3 (S.D.N.Y. Sept. 16, 2011) (in case involving statute of limitations, stating that "where the administrative decision concerns an issue of law, the district court need not adhere to the Rowley rule of deference").[11]

## II.    Plaintiff's IDEA Claims

Defendants assert that plaintiff's IDEA claims regarding the 1994-95 through 2007-08 school years should be dismissed as time-barred. "The IDEA's statute of limitations is an affirmative defense." M.G. v. N.Y.C. Dep't of Educ., -- F. Supp. 2d --, 2014 WL 229835, at *3 (S.D.N.Y. Jan. 21, 2014). Accordingly, at the administrative level, as both the IHO and SRO noted in their decisions, the DOE had the burden of proving that the statute of limitations barred plaintiff's claims. IHO Decision at 10; SRO Decision at 10. Both the IHO and SRO concluded

---

[11] Defendants argue that the court should follow the Third Circuit's approach in D.K. v. Abington School District, 696 F.3d 233 (3d Cir. 2012), which held that "significant deference" is owed to administrative officials' application of the two tolling exceptions to the IDEA statute of limitations. Id. at 245. I find that this rule appears to be in tension with the binding Second Circuit directive that district courts do not need to defer to administrative determinations regarding matters of law and statutory interpretation. In any event, since my ruling on the accrual of plaintiff's IDEA claims makes it unnecessary to address the IDEA's tolling exceptions, it is also unnecessary to address the level of deference owed to the administrative determinations on this issue.

that the DOE met its burden and dismissed the IDEA claims for the years in question.

Since an IDEA claim accrues when the parent "knew or should have known" about the claim, 20 U.S.C. § 1415(f)(3)(C), determining whether a particular claim is time-barred is necessarily a fact-specific inquiry. The task in this case is made considerably more difficult because plaintiff's claims are so numerous, covering a sixteen-year period between 1994 and 2010 and raising sweeping challenges to nearly every aspect of his special education program for each of those years. For example, plaintiff's due process complaint alleged, inter alia, that "[e]very IEP and placement developed for K.H. during the time he was eligible for public education in New York" was inadequate in fifteen enumerated ways, that the DOE did not ensure that his IEPs were properly implemented, and that, in some years, the DOE failed to develop an IEP for him at all. Defs.' Hr'g Ex. 1, ¶¶ 22-24. Similarly, in this district court suit, plaintiff alleges that defendants violated the IDEA "by displaying a disregard of virtually every provision . . . with regard to K.H.'s education" and lists twenty-one "specific individual violations of the law." Am. Compl. ¶ 610. On this motion, the parties have addressed the application of the statute of limitations to each school year. However, neither party has attempted to identify how many different IDEA claims K.H. may be raising for each school year, let alone address when K.H.'s parent knew or should have known about each of those claims. Nor did the IHO or SRO undertake this type of fine-grained analysis at the administrative level. Instead, the IHO dismissed all claims before 2005-06 as time-barred on the record without conducting any fact-finding, then dismissed all claims from the 2005-06, 2006-07, and 2007-08 school years as time-barred after the hearing. The SRO upheld the IHO's rulings on the statute of limitations.

At this stage, I also find it unnecessary to address the timeliness of each of plaintiff's specific IDEA claims. The instant motion for partial summary judgment comes before the court

based on the parties' desire to ascertain how many school years are at issue in this litigation in order to guide their settlement discussions. Based on the record before me, I conclude that the IHO and SRO erred in summarily dismissing all of plaintiff's IDEA claims before the 2008-09 school year as time-barred because plaintiff has asserted a timely IDEA claim spanning his entire educational career. Among his claims, plaintiff asserts that the DOE failed to identify, diagnose, and address his learning disabilities. Defs.' Hr'g Ex. 1, ¶¶ 40-42, 55(d)-(e); Am. Compl. ¶¶ 610(b)-(c). I conclude that this claim did not accrue until 2010, when plaintiff obtained the evaluation from Dr. Newman that diagnosed him with specific learning disabilities. Until that point, plaintiff could not have been aware of his claim challenging the adequacy of the DOE's prior evaluations. Nor could plaintiff have been aware of his related claim that the DOE, acting on inadequate evaluations, placed him in settings that were inappropriate for his particular needs, including classes for emotionally disturbed and intellectually disabled children. This claim covers all of plaintiff's years in the DOE schools and goes to the heart of whether the DOE provided him a free appropriate public education during those years. Since this claim did not accrue until 2010, it falls within the IDEA's statute of limitations and precludes dismissal of plaintiff's claims regarding any of the school years from 1994-95 onward.

The school records submitted as evidence by the DOE show that Dr. Newman's 2010 evaluation was the first time that plaintiff became aware that he might have specific learning disabilities, as well as the ability to achieve significantly more academically with targeted intervention to address those disabilities. Throughout his time in the DOE schools, staff had offered K.H.'s mother and grandmother varying explanations for his constant and severe academic challenges. After K.H. struggled during his early years in school, an evaluation in 1996 found that he had "significant behavioral difficulties," and the IEP team changed his

classification to "Emotionally Disturbed" and placed him in a program for children with severe emotional challenges. When that setting also proved unsuccessful, an evaluation in 1998 found K.H.'s intelligence to fall within the "Mentally Retarded" range, and the DOE moved him to a different program for children with behavioral disturbance and intellectual disabilities. In 1999, evaluations reported that the classwork in that setting was "too difficult" for K.H., found his IQ to be in the "borderline range," and suggested that in utero drug exposure and other environmental factors might have contributed to his difficulties in school.

At various points, the DOE evaluations did suggest that plaintiff exhibited signs of learning disabilities. For example, the 1999 evaluation proposed that a "Learning Disorder" be ruled out. In 2000, an evaluation removed plaintiff's diagnosis of "mild mental retardation," found that his cognitive abilities fell in the borderline range, and noted that his significant academic delays suggested "the presence of functional learning disabilities." An educational evaluation in 2003 reported that K.H. was a "non-reader" who struggled with decoding and appeared to have trouble with "visual perception of letters." However, at most, the record suggests that the DOE mentioned learning disabilities as a possible explanation for plaintiff's academic challenges, along with, at various times, an intellectual disability, attention problems, emotional disturbance, and in utero drug exposure. The 2010 report by Dr. Newman is the first time in the record that an evaluator conducted a neuropsychological examination and provided plaintiff with a diagnosis of specific learning disabilities. Therefore, it is the first time that plaintiff could have been on notice of his claim regarding the DOE's failure to identify and address those learning disabilities earlier.

Defendants argue that plaintiff's mother and grandmother should have been on notice of this claim before 2010 because they were aware that he was not making academic progress.

Clearly, plaintiff's mother and grandmother, and indeed plaintiff himself, knew far earlier than 2010 that plaintiff's academic skills were well below grade level and that he could not read. Both plaintiff's mother and grandmother attended multiple IEP meetings, participated in social history interviews with school staff, and acknowledged that they were aware of K.H.'s academic challenges. As defendants argue, "K.H.'s mother had ample notice of DOE's unsuccessful efforts to educate K.H." Defs.' Reply Mem. of Law ("Defs.' Reply"), Dkt. #63, at 6. Defendants argue that K.H.'s mother therefore should have known that the DOE's evaluations were not properly identifying his needs and should have challenged the adequacy of the evaluations at the time that they were conducted. Id. at 8, 11-12. However, I simply cannot say that K.H.'s mother or grandmother should have known to file a due process complaint when they learned how little progress K.H. was making in school, because they had no reason to know how much progress K.H. was capable of making. Instead, K.H.'s mother and grandmother might well have believed that K.H. simply did not have the ability to learn how to read, based on the series of evaluations conducted by the DOE that provided varying, but consistently low, estimates of K.H.'s intellectual abilities and at one point even classified him as intellectually disabled.

I agree with plaintiff that the reasoning of Draper v. Atlanta Independent School System, 518 F.3d 1275 (11th Cir. 2008), is persuasive. In that case, a 20-year-old man brought an IDEA claim on his own behalf, alleging that the school system had improperly evaluated him in 1998, when he was in fourth grade, and placed him in self-contained classes for students with "mild intellectual disabilities." Draper v. Atlanta Indep. Sch. Sys., 480 F. Supp. 2d 1331, 1335 (N.D. Ga. 2007). In 2003, when the plaintiff was in ninth grade, the school conducted a new evaluation for the first time since 1998 and determined that he was not intellectually disabled but in fact was "in the low average range of intelligence" and had a learning disability. Id. at 1336. The district

court held that plaintiff's claim challenging his placement in the class for intellectually disabled students was not time-barred because it did not accrue until he got the new evaluation in 2003. Id. at 1341. The district court rejected the argument that the claim accrued earlier when the plaintiff's parents consented to his placement and participated in IEP meetings, because the parents "did not have the critical facts to know that [the plaintiff] had been injured by this placement until they received the results of the testing in 2003" that showed that plaintiff was not intellectually disabled. Id. The Eleventh Circuit upheld the district court's ruling on the statute of limitations. 518 F.3d at 1288.

Here, too, even though K.H.'s mother and grandmother attended IEP meetings and consented to special education placements over the years, plaintiff did not have the "critical facts" to know that he had been injured until he received the evaluation by Dr. Newman in 2010 that called his prior evaluations and placements into question. Defendants argue that Draper is distinguishable because the school district in that case failed to conduct any evaluations of the student at all for five years, while here the record shows that the DOE conducted multiple evaluations and "recognized that K.H. had characteristics of a learning disabled student." Defs.' Mem. 32-33.[12] However, the relevant analysis in Draper did not rely on the school district's failure to conduct evaluations. Instead, both the district and circuit courts found that the family could not have been aware of the claim that their son had been misdiagnosed until they received the results of the new testing. In this case, the record shows that the DOE offered K.H.'s family numerous possible explanations for his problems in school but never identified the specific

---

[12] Defendants also argue that the issue of when the plaintiff's claim accrued was not before the Eleventh Circuit on appeal in Draper. Therefore, defendants argue, the circuit court's discussion of that issue was dicta with insufficient support and should not be followed. Defs.' Reply 9-11. Yet the Eleventh Circuit's opinion clearly states that, on appeal, the school district argued that the plaintiff's complaint about his prior placement was time-barred. Draper, 518 F.3d at 1287. The Eleventh Circuit upheld the district court's finding that the claim was not time-barred. Id. at 1288. Therefore, this issue of when the claim accrued was squarely before the circuit court. The court's discussion, while not binding in this circuit, provides persuasive reasoning to help resolve an analogous issue in this case.

learning disabilities that Dr. Newman diagnosed in the 2010 evaluation. Following the approach of the Eleventh Circuit in Draper, I decline to hold that K.H.'s family should have been expected to know "something that the trained professionals of the School System did not admit they knew" or "be blamed for not being experts about learning disabilities." Draper, 518 F.3d at 1288.

Courts within this Circuit have also applied an analysis similar to the Eleventh Circuit's analysis in Draper, holding that IDEA claims did not accrue until the family gained new information that made them aware of inadequacies in the student's prior special education program. In C.B. v. Pittsford Central School District, a parent sought compensatory tutoring services for a prior school year when she alleged that the school district had failed to address her son's learning disability. The court rejected the SRO's finding that the parent's claim had accrued when she sent an e-mail to the district complaining that it had not implemented an assistive technology evaluation. 2010 WL 1533392, at *18. Instead, the court found that the claim accrued at the later date when the parent hired an educational consultant and first became aware that her son's IEP failed to provide support for his "deficits in executive functioning." Id. at *19. In K.P. v. Juzwic, 891 F. Supp. 703 (D. Conn. 1995), a 21-year-old student with severe emotional disabilities alleged that he had been denied a free appropriate public education between the ages of 8 and 19 and sought compensatory education. The district court found that the plaintiff did not discover his injury until he entered a new placement where his "substantial gains . . . indicated that he had the capacity to develop life skills, and vocational skills and attain academic goals previously thought impossible." Id. at 716-17. It was only at that point when the plaintiff became "aware that the education, services, and diminished expectations and goals" at his prior placement were inadequate.[13] Id. at 717; see also Somoza v. N.Y.C. Dep't of Educ., 475

---

[13] Defendants argue that K.P. is an example of the "rare case where the parent legitimately did not know of her child's lack of progress," since the mother's parental rights had been terminated and her son was in a residential

F. Supp. 2d 373, 386 (S.D.N.Y. 2007), rev'd on other grounds, 538 F.3d 106, 113 (2d Cir. 2008) (holding that 23-year-old student's IDEA claim did not accrue until she had participated in a specialized program "long enough to produce evidence that the education she had previously received had not yielded comparable results, and hence may not have been sufficiently appropriate for her circumstances"). As these cases show, a lack of progress alone is insufficient to put parents on notice of an IDEA claim if the parents have no baseline to assess how much progress their child is capable of making. Instead, the courts found that the IDEA claims did not accrue until the family had reason to know that their children might have made more progress if they had been given different interventions.[14]

To be sure, as defendants argue, even if Dr. Newman offered plaintiff a diagnosis of particular learning disabilities for the first time in 2010, it does not necessarily follow that the DOE's prior evaluations and placements were inadequate. Defendants correctly note that the IDEA mandates services tailored to a child's individual needs, not dictated by a particular diagnosis or classification. Defs.' Mem. 32. Here, defendants argue that Dr. Newman's 2010 evaluation "added little if anything to understanding K.H.'s disabilities," because prior DOE evaluations had recognized the same deficits that Dr. Newman identified, including difficulties with memory and auditory processing. Id. at 31. Defendants also assert that Dr. Newman's

---

placement in another state. Defs.' Reply 12 n.11. Defendants argue that K.P. is distinguishable from this case because K.H.'s mother and grandmother were fully aware of his lack of progress. However, the discussion in K.P. regarding when the plaintiff's claim accrued did not address his mother's lack of knowledge about her son's progress. Instead, the court's determination rested on the finding that the plaintiff did not discover his injury until he made significant gains in a different program and realized that his prior placement had been inappropriate.

[14] A case from outside this circuit that defendants cite in their brief also supports the same analysis. In Miller v. San Mateo-Foster City Unified Sch. Dist., 318 F. Supp. 2d 851 (N.D. Cal. 2004), the district assessed the student and found that he was not eligible for special education. A year later, his parents enrolled him in private school and obtained an independent evaluation that found that he had learning disabilities. Four years later, the parents brought a claim for tuition reimbursement. The court held that the claims accrued at least by the time that the parents obtained the private evaluation that identified his learning disabilities. Id. at 861-62. In that case, unlike in this case, the parents waited to act on the private evaluation for four years, so their claims were time-barred. Still, the district court identified the accrual date as the time when the parents obtained new information that suggested the school's prior evaluations had been incorrect.

diagnosis of dyslexia was merely "tentative" and that "no one else before or since has corroborated" that finding. Defs.' Reply 13. All of these arguments, however, go to the merits of plaintiff's claim, which is not before the court at this stage. When plaintiff received the evaluation from Dr. Newman in 2010, he was on notice for the first time of a claim that the DOE had previously failed to identify and address the specific learning disabilities that Dr. Newman identified. Defendants are, of course, free to argue on the merits that Dr. Newman's diagnoses were incorrect, or that the DOE had provided K.H. with appropriate educational services even if school staff had not reached the same diagnoses. The only issue now is when plaintiff knew or should have known of his claim, not whether his claim will ultimately be successful.

I emphasize also that my finding is specific to the particular facts of this case. Defendants argue that allowing "an expert opinion proffering a new theory to explain a student's difficulties" to "revive[] time barred IDEA claims concerning the adequacy of earlier assessments is an invitation to abuse" and inconsistent with the purpose of the IDEA. Defs.' Reply 13. I agree with defendants that all parties benefit from prompt review of claims regarding a child's educational services. Indeed, the incomplete school record in this case underscores the difficulty of trying to reconstruct, years later, whether a student received a free appropriate public education. However, the IDEA's clear statutory language mandates that a claim does not accrue until the parent "knew or should have known" of the injury. I agree with the reasoning of the courts in Draper, C.B., and K.P. and find that K.H.'s mother and grandmother could not have known of a claim regarding the DOE's failure to identify and address his learning disabilities until he received the evaluation in 2010 that diagnosed him with those learning disabilities. Only at that point did plaintiff have the necessary information to recognize the potential inadequacy of the DOE's prior evaluations and placements.

Therefore, I conclude that the IHO's and SRO's ruling dismissing all of plaintiff's IDEA claims between the 1994-95 and 2007-08 school years as time-barred is not supported by a preponderance of the evidence. Plaintiff has asserted a claim spanning all of those years that is timely because it did not accrue until 2010, the same year that he filed his due process complaint.[15] In light of this finding regarding the accrual of plaintiff's claim, it is unnecessary to address the parties' arguments or the IHO's and SRO's rulings regarding the statutory tolling exceptions under the IDEA.

This finding does not mean that all of plaintiff's numerous IDEA claims accrued when he received the evaluation from Dr. Newman in 2010. For example, to the extent that plaintiff challenges the DOE's failure to produce any IEP for K.H. during the 2006-07 and 2007-08 school years, I agree with defendants that K.H.'s mother knew or should have known at the time that the DOE had not convened an IEP meeting or created an IEP. Defs.' Reply 7-8; cf. Draper, 480 F. Supp. 2d at 1340 (finding claim regarding district's failure to conduct evaluation to be time-barred because mother was aware at the time that her son was not being assessed). However, I find it unnecessary to address the timeliness of every one of plaintiff's specific IDEA claims at this stage. Since plaintiff's claim regarding the failure to identify and address his learning disabilities is not time-barred, he can assert the denial of a free appropriate public education under the IDEA for every year that he was eligible for DOE services. The equitable remedies available under the IDEA are flexible and do not turn on the number of specific IDEA violations asserted for each school year. Accordingly, defendants' motion for partial summary

---

[15] It is not clear which statute of limitations should apply to plaintiff's claims regarding the school years before 2005-06. In 2005, Congress amended the IDEA to add a two-year statute of limitations. 20 U.S.C. § 1415(f)(3)(C). The Second Circuit has not yet decided whether IDEA claims regarding events before 2005 are governed by this two-year statute of limitations, or whether they are governed by the one-year statute of limitations that New York courts generally applied before the IDEA amendments. Somoza, 538 F.3d at 114. However, it is unnecessary to resolve this issue here. Even before the IDEA amendments, New York courts used the same rule to determine when a claim accrued: when the plaintiff knew or should have known of the injury. Id. at 114 n.8. Since I find that plaintiff's claim did not accrue until 2010, it is timely under either a one-year or two-year statute of limitations.

judgment dismissing plaintiff's IDEA claims before 2008-09 as time-barred is denied.

### III.     Plaintiff's Section 504 Claims

Defendants also seek dismissal of plaintiff's Section 504 claims prior to the 2007-08 school year. To the extent that plaintiff raises Section 504 claims relating to his special education program, his claim regarding the DOE's failure to identify and address his learning disabilities is timely for the reasons stated above. Therefore, the IHO's decision dismissing all of plaintiff's Section 504 claims before 2007-08 is not supported by a preponderance of the evidence, and defendants' motion for summary judgment dismissing these claims is denied.

Plaintiff argues that his Section 504 claims are "wholly distinct" from his IDEA claims, because he asserts "sweeping violations of law based on systemic policies and practices that constituted discrimination based on his disability." Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Opp'n"), Dkt. #55, at 71. Although plaintiff has been asserting systemic IDEA and Section 504 claims consistently both in the administrative proceeding and in this litigation, plaintiff has brought this action only on behalf of himself. He seeks relief for individual injuries relating to his special education program and services, and he alleges as part of his claim for relief that the DOE injured him pursuant to illegal practices and policies. In his district court complaint, plaintiff seeks, inter alia, a declaration that defendants have violated his rights, additional compensatory education, damages, and injunctive relief "to prevent continuing and irreparable harm and to enforce the awards of the IHO and SRO." Am. Compl. ¶ 631. Plaintiff does not appear to be seeking injunctive relief relating to the reform of any challenged DOE policies or practices, and he likely would not have standing to do so, since he no longer attends District 75 programs.

Therefore, to the extent that plaintiff alleges that the DOE engaged in systemic discrimination against students with disabilities, plaintiff appears to make this allegation in support of his argument for individual relief. Indeed, plaintiff argues that the existence of a school district's improper policy can be used to establish the "bad faith or gross misjudgment" required to prevail on a Section 504 claim. Pl.'s Opp'n 71. Plaintiff's right to individual relief depends on the timeliness of his individual claims, which I have already addressed. At this stage, I see no need to address the timeliness of plaintiff's systemic challenges separately from the timeliness of plaintiff's individual claims.

## IV. Plaintiff's Section 1983 Claims

Defendants also move to dismiss any Section 1983 claims premised on violations of the Constitution before June 2007 and any Section 1983 claims premised on violations of the IDEA and Section 504 before June 2008. Defs.' Reply 29. Neither the IHO nor SRO addressed plaintiff's Section 1983 claims because they held that they lacked jurisdiction over them. Accordingly, there have been no administrative determinations relating to these claims.

None of the Section 1983 causes of action asserted in plaintiff's complaint are subject to dismissal on statute of limitations grounds at this stage. Plaintiff asserts that defendants, acting under color of state law, deprived him of liberty or property interests created by the IDEA, Section 504, and New York state law. Am. Compl. ¶ 614; Pl.'s Opp'n 77-78. Plaintiffs assert that the school district can be held liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), because the actions that injured plaintiff were taken pursuant to official policies and customs. Pl.'s Opp'n 78. For the reasons already stated, plaintiff has asserted timely IDEA and Section 504 claims, so the corresponding Section 1983 claims are timely as well.

The other specific Section 1983 causes of action alleged in plaintiff's complaint are clearly timely and do not fall within defendants' motion for summary judgment. Plaintiff asserts that defendants failed to "timely implement the orders of the IHO and SRO," which relates to events occurring in 2010. Am. Compl. ¶ 616. Plaintiff also asserts that defendants discharged him from DOE schools without due process, which relates to events occurring no earlier than September 2008. Id. ¶ 617.

The parties' briefs do not sufficiently address whether plaintiff is also asserting other Section 1983 claims and, if so, when those claims may have accrued. For example, the complaint asserts that "[b]lack males with disabilities, like K.H., were significantly over-represented in programs for District 75 for children classified as [Emotionally Disturbed] during the years that K.H. attended those programs." Id. ¶ 86. This allegation appears to raise a claim of racial discrimination, and K.H. did raise this claim at the administrative level, asserting that the DOE violated his rights under Section 1983 by "engaging in a pattern and practice of segregating students like [K.H.] in District 75 based upon his race and disability classification." Defs.' Hr'g Ex. 1 at ¶ 55(i). However, the district court complaint does not specifically include a racial discrimination claim under its list of Section 1983 causes of action. Am. Compl. ¶¶ 613-19.

Since the Section 1983 claims were never addressed at the administrative level, and since the parties' briefs do not provide sufficient guidance on this issue, I will not attempt to discern which specific Section 1983 claims are being asserted and address the timeliness of each one. Defendants' motion for summary judgment on statute of limitations grounds relating to plaintiff's Section 1983 claims is denied at this juncture.

**CONCLUSION**

For the foregoing reasons, defendants' motion for partial summary judgment is denied. The IHO's and SRO's dismissal of all of plaintiff's IDEA claims before 2008-09 on statute of limitations grounds is not supported by a preponderance of the evidence. Plaintiff's claim regarding the DOE's failure to identify and address his learning disabilities did not accrue until 2010, so he has asserted a timely claim for the denial of a free appropriate public education during every year that he was eligible to attend DOE schools.

In reaching this decision, I do not make a finding regarding the timeliness of every one of the multitude of individual and systemic challenges that plaintiff has asserted in this litigation. I conclude only that plaintiff's IDEA claims regarding every challenged school year can go forward based on his timely claim regarding the misdiagnosis of his learning disabilities. To the extent that plaintiff's Section 504 and Section 1983 claims relate to the denial of appropriate special education services, those claims are likewise timely. To the extent that plaintiff raises other Section 504 and Section 1983 claims, I decline to reach the timeliness of those claims at this stage.

SO ORDERED.


__/s/_____
Allyne R. Ross
United States District Judge


Dated:        August 6, 2014
              Brooklyn, New York